**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

| | | |
|---|---|---|
| **SILVERIO CASARES, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL NO. B-11-107** |
| | § | |
| **AGRI-PLACEMENTS INTERNATIONAL,** | § | |
| **INC. and ELAINE FLAMING,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION & ORDER

BE IT REMEMBERED, that on March 31, 2014, the Court considered Defendants Agri-Placements International, Inc. and Elaine Flaming (referred to collectively as "Defendants" and individually as "API" and "Flaming" respectively) Motion to Dismiss, 75; the response and reply, Dkt. Nos. 83, 85; Plaintiffs' Second Amended Complaint and the attached exhibits, Dkt. No. 62, and the entire record in this case. Defendants move to dismiss Plaintiffs' claims against them in Plaintiffs' Second Amended complaint for lack of personal jurisdiction and for failure to state a claim for which relief can be granted. *See* FED. R. CIV. P. 12(b)(2) and (6). Because one of the two defendants made a general appearance when it filed an earlier motion for summary judgment on third-party claims then pending against it, the Court concludes that it waived its personal-jurisdiction defense, *see* FED. R. CIV. P. 12(h), and finds that Plaintiffs have made a prima facie showing of the other defendant's minimum contacts with Texas. The Court also denies in part Defendants' motion to dismiss for failure to state a claim for which relief may be granted, finding that Plaintiffs Second Amended Complaint pleads any fraud-based claims with the specificity required by Federal Rule of Civil Procedure 9(b) and Plaintiffs state a plausible claim that Defendants engaged in solicitation of agricultural workers within the meaning of the Migrant And Seasonal Agricultural

Worker Protection Act, *see* 29 U.S.C. § 1802(6)–(7), as construed by the Fifth Circuit in *Malacara v. Garber*, 353 F.3d 393 (5th Cir. 2003). However, the Court grants Defendants' motion insofar as it seeks dismissal of Plaintiffs' third-party breach-of-contract claim because Plaintiffs have not adequately alleged the element of causation.

## I.   BACKGROUND

This litigation stems from Plaintiffs' employment during October of 2009 as migrant agricultural workers at a cotton gin owned and operated by former defendant Yoakum County Cooperative Gin ("YCCG") in Plains, Texas. *See* Second Am. Compl. ¶ 10. The six plaintiffs aver that they are all United States citizens or lawful permanent residents residing in Cameron or Hidalgo County, Texas. *Id.* ¶¶ . 3–4. According to their live complaint, they traveled approximately 700 miles from South Texas to Plains after accepting YCCG's offer to pay them $9.27 an hour over an expected 10-month term of employment, *see id.* ¶¶ 70–73 but, after they arrived YCCG refused to pay them more than the federal minimum wage of $7.35 an hour and provided substandard housing. *See id.* ¶¶ 70, 76. Plaintiffs state that they left YCCG on October 29, 2009, after YCCG's superintendent retaliated against them for inquiring about their pay rate. *See id.* ¶¶ 83–88. This lawsuit followed.

### A.  H-2A Program and YCCG's Form ETA-790

The H-2A non-immigrant visa program figures prominently in the factual background of Plaintiffs' live complaint. The H-2A program, which is administered in part by the Department of Labor ("DOL"), derives its informal name from its codification in the definitions section of the Immigration and Nationality Act. *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(A) (2012); *See also generally Sweet Life v. Dole*, 876 F.2d 402, 406 (5th Cir. 1989) (discussing Congress's decision in 1986 to provide different procedures for guest agricultural workers under H-2A program and other temporary workers under H-2B program). Congress requires the DOL to issue a labor certification to an employer before the Attorney General can grant temporary H-2A visas, but the Secretary of Labor can do so "only if the employer first demonstrates that he has made a good faith, active attempt to recruit American

workers but could not find sufficient able, willing, and qualified workers for his needs." *Malacara*, 353 F.3d at 396-97 (citing 8 U.S.C. § 1188(a)(1)(A)); *see also* 8 U.S.C. § 1181(a)(1)(B) and 1181(b)(4) (2012) (requiring Secretary of Labor to certify that "the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed" and an employer to demonstrate that he or she has "made positive recruitment efforts within a multi-state region of traditional or expected labor supply"). Federal regulations provide that "[t]he employer's job offer must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H–2A workers." 20 C.F.R. § 655.122(a) (Further requiring, inter alia, "same level of minimum benefits [and] wages" to be offered to U.S. workers.).

To obtain a labor certification, an employer must submit, inter alia, a job order on a Form ETA-790. *Id.* § 655.121(a)(1). A specimen of such a form allegedly submitted by YCCG appears in the record. *See* Dkt. No. 62 Ex. 3; *see also* 20 C.F.R. § 655.122(d)-(q) (listing required contents of job offer). This form, which Plaintiffs allege was submitted to the DOL on or around August 17, 2009, offers work expected to last 10 months at YCCG's cotton ginning facility in Plains, Texas beginning on October 1, 2009. *See id.* at 1. YCCG will provide housing for workers, *see id.* at 3, and the amount of $9.27 per hour appears in the blank for the pay rate. *Id.* at 1. Federal regulations require the employer to offer and pay the greatest of several enumerated wage rates including, as facially relevant here, the adverse effect wage rate for agricultural workers determined annually by the United States Department of Agriculture. *See* 20 C.F.R. § 655.120(a). Plaintiffs aver that this rate was $9.27 per hour at all times relevant to this litigation. *See* Second Am. Compl. ¶ 34. Once the DOL has cleared the Form ETA-790 job order, it is placed into an interstate clearance system used for recruiting domestic workers where it is apparently available to state employment agencies such as the Texas Workforce Commission (TWC). *See* 20 C.F.R. § 655.122(c); *Malacara*, 353 F.3d at 396-97

(discussing use of program by farmer and receipt of job order by TWC in McAllen, Texas).

### B. Procedural History

Plaintiffs named YCCG as the sole defendant in their original complaint; s*ee* Dkt. No. 1 ¶ 7, brought claims under Texas law for fraud, breach of contract, and negligent misrepresentation and also alleged YCCG violated provisions of the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. §§ 1801 et seq. and the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. *See id*. ¶¶ 39—56. YCCG filed a partial motion to dismiss for failure to state a claim for which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) which this Court denied.[1] Dkt. No. 11.

Discovery commenced, and YCCG, without opposition, subsequently obtained leave to file a third-party complaint against API, an Oklahoma corporation which keeps its principal place of business in Fairview, Oklahoma. *See* Dkt. No. 17. In its third-party complaint, YCCG alleged that it contracted with API "to search for and obtain seasonal workers for YCCG's cotton ginning season through the H-2A visa program." Dkt. No. 18 ¶ 5. Specifically, YCCG pled that API did not follow its instructions to amend the form ETA-790 to reflect that YCCG offered employment from October 15, 2009, through January 1, 2010, offered in the original form. *See id*. ¶ 6; *see also* Dkt. No. 62 Ex. 3 at 1 (giving "October 1, 2009, to August 1, 2010," as the "anticipated period of employment"). YCCG therefore asserted negligence, breach of contract, and negligent misrepresentation claims against API. *See* Am. Third-Party Compl. ¶¶ 11–22. API responded to the third-party complaint by filing a self-styled motion for summary judgment arguing that YCCG's third-party complaint was insufficient and that the applicable statute of limitations barred YCCG's claims. Dkt. No. 30. In response, Plaintiffs sought leave to amend their complaint to assert directly against API claims under the AWPA and fraud,

---

[1] After this Court denied its initial motion to dismiss, YCCG filed a motion to transfer this case to the Lubbock Division of the United States District Court for the Northern District of Texas. Dkt. No. 12. This court denied that motion as well. Dkt. No. 15.

negligent misrepresentation, and for each of the API-YCCG services contract as third-party beneficiaries. *See* Proposed First Am. Compl. ¶¶ 47–68, Dkt. No. 34 Ex. 1 .

This Court granted in part and denied in part API's self-styled motion for summary judgment and denied Plaintiffs' motion to amend. Dkt. No. 59. Because of the nature of the relief requested, the Court treated API's motion for summary judgment as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), dismissed YCCG's breach-of-contract claim under the Texas economic-loss rule, and dismissed YCCG's other claims with leave to refile. *See id.* at 16. Conducting a Rule 12(b)(6) analysis, this Court also held that permitting Plaintiffs to file their proposed amended complaint would be futile because Plaintiffs failed to plead the proposed fraud-based claims with the particularity required by Federal Rule of Civil Procedure 9(b) and did not adequately allege the elements of a breach-of-contract claim. *See id.* at 5–11. As to the breach-of-contract claim, this Court determined that Plaintiffs did not allege that API failed to perform any obligation of the API-YCCG contract or raise a claim that Plaintiffs suffered damages as a result of any alleged breach above the speculative level. *See id.* at 5–7. Rather than dismissing the third-party complaint, the Court granted YCCG and Plaintiffs leave to amend their respective pleadings. *Id.* at 16.

YCCG did not amend its third-party complaint; instead, it voluntarily dismissed its third-party claims against API with prejudice. *See* Dkt. No. 61 at 1; Dkt. No. 63. Plaintiffs filed their self-styled Second Amended Complaint adding Robertson and Flaming, API's Chief Executive Officer, as defendants. *See* Dkt. No. 62 ¶¶ 6, 8. However, Plaintiffs subsequently voluntarily dismissed with prejudice their claims against YCCG and Robertson. *See* Dkt. No. 82. As a result, only Plaintiffs' claims against API and Flaming remain pending, and those claims are the subject of the motion to dismiss now before the Court, Dkt. No. 75. The parties have agreed to suspend the scheduling-order deadlines pending resolution of the pending motion. *See* Dkt. No. 87 at 1-2.

### C. Plaintiffs' Second Amended Complaint

In their Second Amended Complaint, Plaintiffs bring claims for breach of the API-YCCG contract and negligent misrepresentation against API only; the former claim is based on a third-party beneficiary theory.  *See* Dkt. No. 62 ¶¶ 113–26.  Plaintiffs also plead AWPA claims and common-law fraud and conspiracy claims against both API and Flaming together with YCCG and Robertson.  *See id*. ¶¶ 96, 127–39.  Because Defendants have filed a Rule 12(b)(6) motion, the Court recites Plaintiffs' well-pleaded factual allegations in their Second Amended Complaint in the light most favorable to them.

In their conspiracy count, Plaintiffs allege that YCCG, API, Robertson, and Flaming reached an agreement "to get H2A visas for foreign guest workers without having to pay those workers the $9.27 wage required by DOL."  Dkt. No. 62 ¶ 136.  According to that complaint, approximately 125 North Texas farmers own YCCG and have used it to gin the cotton produced in their fields since 1962. *See id.* ¶¶ 9–11.  Each year, YCCG hires approximately two dozen employees for a three-month ginning season beginning in or around October.  *Id*. ¶ 12, 14.  YCCG hired Robertson as its manager in "early 2009."  *Id*. ¶ 16.  Soon after YCCG hired Robertson, he and YCCG's superintendent Socorro Gallegos ("Gallegos") reached an agreement to hire friends and relatives of Gallegos who lived near Gallegos's childhood home in Meoqui, Chihuahua, Mexico.  *See id*. ¶¶ 18–21.  Plaintiffs specifically allege that Robertson and Gallegos intended and expected these friends and relatives to accept no more than the federal minimum wage without complaint despite the requirement that H-2A workers be paid at least $9.27 per hour.  *See id*. ¶¶ 21–22.

"API holds itself out to the public as an expert in helping agricultural employers access foreign guest workers under the 'H2A' visa program."  *Id*. ¶ 25.  Robertson and Flaming reached an oral contract by telephone.  *Id*. ¶ 30.  For a fee, API agreed to act as YCCG's agent to secure H-2A workers for the 2009 ginning season, advise YCCG of its H-2A obligations, advertise the terms of employment YCCG offered, and "advise YCCG what to tell the foreign guest workers whom

YCCG alone would recruit." *Id.* Flaming prepared and signed the Form ETA-790 transmitted to the DOL in support of YCCG's H-2A application, and all defendants knew that the DOL would likely forward the Form ETA-790 to state employment agencies to recruit domestic workers. *See id.* ¶¶ 38–40, 42, 45; *see also id.* Ex. 3. Plaintiffs plead alternatively that API and Flaming concealed the required wage rate from YCCG; they were unaware of YCCG's intent to pay less than the required wage; or API and Flaming colluded with YCCG. *Id.* ¶ 35. Also alternatively, Plaintiffs allege that API incorrectly advised YCCG that it had to seek foreign guest workers for the maximum 10 months allowed by law; API failed to comply with YCCG's request to advise DOL that YCCG offered employment for six or fewer months; or API and YCCG colluded to misstate the length of the employment term. *See id.* ¶ 37.

The TWC received YCCG's Form ETA-790 and made Plaintiffs aware of the employment opportunity in September of 2009. *See id.* ¶¶ 54–55. Robertson interviewed each plaintiff by telephone between September 17 and 29, 2009. *Id.* ¶ 56. A TWC outreach worker accompanied each plaintiff during the interview. *Id.* ¶ 57. "During these interviews, [] Robertson repeated" that the employee would be paid the $9.27 hourly rate, overtime would be paid, and employment would last for a 10-month term. *Id.* ¶ 58. Robertson also stated during these interviews that YCCG anticipated moving the employment start date form October 1 to October 15, 2009, and the TWC outreach worker noted this discrepancy. *Id.* ¶ 59. Robertson hired each plaintiff after his respective interview, and each traveled to YCCG in October of 2009. *See id.* Meanwhile, Robertson sent a letter dated October 1, 2009, to API which API forwarded to the DOL requesting permission to change the term of employment from ten to three months citing drought and cold weather as the reasons, but Plaintiffs allege these stated reasons were pretextual. *See id.* ¶¶ 64–67.

Plaintiffs allege that YCCG provided them statutorily inadequate housing, *see id.* ¶¶ 75–76, and, when they received their first paychecks on October 22, 2009, YCCG paid them only $7.35 for the first 40 hours worked and $11.03 per overtime

hour. *Id.* ¶ 79. Three of the plaintiffs complained to Robertson who referred them to Gallegos who in turn told them that YCCG would not and had not ever paid employees more than the federal minimum wage. *See id.* ¶¶ 79, 82. Plaintiffs departed approximately a week later on October 29, 2009. *Id.* ¶ 85. They aver that Gallegos subjected them to hostile treatment in retaliation, and they have reason to believe Gallegos wanted them to leave before their pay-rate complaints spread to the H-2A workers. *Id.* ¶¶ 86–87.

## II. PERSONAL JURISDICTION

Pursuant to 28 U.S.C. § 1331, this Court has original subject-matter jurisdiction over Plaintiffs' AWPA claims because they arise under a federal statute. Furthermore, this Court has supplemental jurisdiction over Plaintiffs' claims under Texas law because they arise out of the same case or controversy as Plaintiffs' AWPA claims. *See* 28 U.S.C. § 1367 (2012).

API and Flaming argue that this Court lacks personal jurisdiction over them. Plaintiffs respond that they waived the defense of lack of personal jurisdiction when the first motion for summary judgment was filed. *See* Dkt. No. 30 at 1. A close reading of that motion shows, however, that Flaming did not join in it. *See id.* at 1. Thus only API waived this defense.

### A. Motions to Dismiss for Lack of Personal Jurisdiction

"The plaintiff bears the ultimate burden of establishing jurisdiction over a non-resident defendant." *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576, 584–85 (5th Cir. 2014) (citing *Caldwell v. Palmetto State Sav. Bank of S.C.*, 811 F.2d 916, 917 (5th Cir. 1987)). When a defendant moves to dismiss a complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure (12)(b)(2) and the district court does not hold an evidentiary hearing, "a prima facie showing [of personal jurisdiction] is all that is required." *Companion Prop. and Cas. Ins. Co. v. Palermo*, 723 F.3d 557, 559 (5th Cir. 2013)) (quoting *Luv N' Care, Ltd. v. Insta–Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006)). "In determining whether a defendant is subject to personal jurisdiction, a district court must accept as true the uncontroverted factual allegations in the plaintiff's complaint." *Id.* (citing

*Latshaw v. Johnston*, 167 F.3d 208, 210–11 (5th Cir. 1999)); *see also In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d at 585 (citation omitted) (discussing rule that plaintiff has burden to show personal jurisdiction by a preponderance of the evidence if district court holds evidentiary hearing).

The Due Process Clause of the Fourteenth Amendment prevents a state from binding a non-resident to a judgment rendered by one of its courts absent "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Walden v. Fiore*, 134 S.Ct. 1115, 1121 (2014) (internal quotation marks in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Id.* (quoting *Daimler AG v. Bauman*, 134 S.Ct. 746, 753 (2014)). "Because Texas's long-arm statute reaches to the constitutional limits, the question [this Court] must resolve is whether exercising personal jurisdiction over the defendant offends due process." *Vanderbilt Mortg. and Fin., Inc. v. Flores*, 692 F.3d 358, 375 n.14 (5th Cir. 2012) (quoting *Clemens v. McNamee*, 615 F.3d 374, 378 (5th Cir. 2010)); *accord. Companion Prop. & Cas. Ins. Co.*, 723 F.3d at 559 (citation omitted). In the context of the requisite minimum contacts, "[p]ersonal jurisdiction may be 'specific' or 'general.'" *Companion Prop. & Cas. Ins. Co.*, 723 F.3d at 559; *accord. Walden*, 134 S. Ct. at 1122 n6. (discussing specific and general jurisdiction). To show that this court has general jurisdiction, Plaintiffs must demonstrate that Defendants' "contacts are 'continuous and systematic,' so that the exercise of jurisdiction is proper irrespective of the claim's relationship to the defendant's contact with the forum." *Id.* (quoting *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 438 (1952)); *see also Walden*, 134 S. Ct. at 1122 n.6 (discussing doctrines of general and specific jurisdiction). To decide whether Plaintiffs have made a prima facie showing of specific personal jurisdiction, this Court asks: "(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or

results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable." *Vanderbilt Mortg. and Fin., Inc.*, 694 F.3d at 375 (quoting *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009)).

## B. Waiver of Defense of Lack of Personal Jurisdiction

API responded to YCCG's amended third-party complaint with a self-styled motion for summary judgment.  Dkt. No. 30.  This Court, however, resolved that motion based on its substance under Rule 12.  *See* Dkt. No. 59 at 16.  That motion omitted the defense of lack of personal jurisdiction.

Under Federal Rule of Civil Procedure 12(b), a party may assert seven enumerated defenses by motion, including lack of personal jurisdiction under Rule 12(b)(2).  These defenses may be joined together in a single motion, FED. R. CIV. P. 12(g)(1), and "[a] motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed."  FED. R. CIV. P. 12(b).  Indeed, with certain exceptions not applicable here, once a party files a Rule 12 motion, it "[can]not make another motion under [Rule 12] raising a defense or objection that was available to the party but omitted from its earlier motion."  FED. R. CIV. P. 12(g)(2).  A party waives a defense under Rule 12(b)(2)–(5) by omitting it from a Rule 12 motion or neglecting to include it in a responsive pleading.  *See* FED. R. CIV. P. 12(h)(1).  Hence, "a party's right to object to personal jurisdiction certainly is waived under Rule 12(h) if such party fails to assert that objection in his first pleading or general appearance."  *Jackson v. FIE Corp.*, 302 F.3d 515, 523 (5th Cir. 2002) (citations omitted).  Therefore, to the extent it sought relief under Rule 12(b), API's omission of a personal-jurisdiction defense from its motion for summary judgment waived that defense.  *See id.*

API's request for summary judgment under Federal Rule of Civil Procedure 56 in that motion does not alter the waiver analysis.  "A party makes a general appearance whenever it invokes the judgment of the court on any question other than jurisdiction."  *City of Clarksdale v. BellSouth Telecomm., Inc.*, 428 F.3d 206, 214 (5th Cir. 2005) (quoting *Maiz v. Virani*, 311 F.3d 334, 340 (5th Cir. 2002)).  By its very nature, a motion for summary judgment asks a federal district court to

enter judgment on the merits. *See Rivera v. PNS Stores, Inc.*, 647 F.3d 188, 191 (5th Cir. 2011) ("[S]ummary judgment . . . is the procedural equivalent of a trial and is an adjudication of the claim on the merits . . . ."). Accordingly, omission of a lack-of-personal-jurisdiction defense from such a motion waives that defense under Rule 12(h) as surely as omission from a Rule 12 motion. *See, e.g., Int'l Broth. of Boilermakers, Iron Shipbuilders, Forgers and Blacksmiths Local Lodge No. 582 v. Delta S. Co., Inc.*, 602 F. Supp. 625, 631 (M.D. La. 1985) ("The company's final argument is that the court lacks jurisdiction over the person of the defendant . . . . The court finds that the defendant has waived this defense by filing this motion for summary judgment.").

Relying on the settled rule that "if a plaintiff's claims relate to different forum contacts of the defendant, specific jurisdiction must be established for each claim," API contends that, at most, it waived its personal-jurisdiction defense as to YCCG's third-party claims, not Plaintiffs' claims. *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 275 (5th Cir. 2006). That rule has bite when the defense of lack of personal jurisdiction has not been waived because "[p]ermitting the legitimate exercise of specific jurisdiction over one claim to justify the exercise of specific jurisdiction over a different claim that does not arise out of or relate to the defendant's forum contacts would violate the Due Process Clause." *Id.* (considering plaintiff's design-defect claim because it did not arise out of same set of contacts and other claims). The principle embodied in Rule 12(h), as the Supreme Court has explained, allows a "party [to] insist that the limitation be observed, or he may forgo that right, effectively consenting to *the court's* exercise of adjudicatory authority." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (emphasis added) (citing Rule 12(h) and *Ins. Corp. of Ireland Ltd. V. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982). Consistent with what the term "general appearance" implies, *see Maiz* 311 F.3d at 340, when a party consents to the exercise of personal jurisdiction, it consents to the Court before which it has been hailed "exercis[ing] adjudicatory authority over it," *id.*, and the defendant's consent furnishes the answer to the question of whether "maintenance of the suit" is incompatible with

Due Process. *Int'l Shoe*, 326 U.S. at 310; *see also Ins. Corp. of Ireland*, 456 U.S. at 703 ("regardless of the power of the State to serve process, an individual may submit to the jurisdiction of the court by appearance."); *Maiz*, 311 F.3d at 341 n.6 (analyzing waiver without regard to nature of particular claims); *Travelers Indem. Co. v. Calvert Fire Ins. Co.*, 798 F.2d 826, 831–32 (5th Cir. 1986) (distinguishing case in which waiver found in part based on fact that waiver in case at bar allegedly occurred in different civil action to which defendant was never a party).   For example, the Supreme Court held in *Adam v. Saenger* that "[t]here is nothing in the Fourteenth Amendment to prevent a state from adopting a procedure by which a judgment in personam may be rendered in a cross-action against a plaintiff in its courts, upon service of process or of appropriate pleading upon his attorney of record. The plaintiff having, by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes for which justice to the defendant requires his presence." *Adam v. Saenger*, 303 U.S. 59, 67–68 (1938).  By asking this Court to render a binding summary judgment in its favor with claim preclusive effect, API submitted itself to the adjudicatory authority of this Court in this action as to the nucleus of operative facts forming the basis of those claims "for all purposes."  *Id.* at 67.

However, YCCG did not name Flaming as a defendant in its third-party complaint. *See* Dkt. No. 18 at 1–2.  Not surprisingly, Flaming did not join the self-styled motion for summary judgment seeking dismissal of YCCG's third-party claims, *see* Dkt. No. 30 at 1, and she therefore did not invoke this Court's judgment on the merits.  The Court therefore reaches her motion to dismiss for lack of personal jurisdiction but not that of API.

### C. Analysis

Defendants cite no legal authority in their motion to dismiss for lack of personal jurisdiction.  *See* Dkt. No. 75 at 1.  In their response to Defendants' motion to dismiss, Plaintiffs identify seven alleged categories of contacts which they argue are jointly and severally sufficient to demonstrate prima facie the minimum

contacts necessary for personal jurisdiction.  *See* Resp. to M. to Dismiss 4–6, Dkt. No. 83.   These alleged bases include API and Flaming's agreement to attempt to recruit in Texas, telephone calls between Robertson and Flaming, written correspondence regarding formation and performance of API-YCCG contract, API's cashing a check from YCCG presumptively drawn on a Texas bank, API's correspondence with TWC, API's solicitation of Texas businesses through its website, and alleged website showing API and Flaming served as labor certification agents for Texas businesses between 50–70 times in 2010 and 2011.   For the first time in her reply, Flaming argues that, regardless of whether these allegations establish personal jurisdiction over API, all of the alleged Texas contacts arise solely in her capacity as API's Chief Executive Officer, and the fiduciary-shield doctrine prohibits Plaintiffs from imputing API's contacts to her.

Generally, "while 'the parties' relationships with each other may be significant in evaluating their ties to the forum,' the due process requirements of *International Shoe* 'must be met as to each defendant over whom a . . . court exercises jurisdiction.'"   *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002) (quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)).   Under the fiduciary-shield doctrine, "an individual's transaction of business within the state solely as a corporate officer does not create personal jurisdiction over that individual though the state has in personam jurisdiction over the corporation."   *Stuart v. Spademan*, 772 F.2d 1185, 1197 (5th Cir. 1985) (footnote and citations omitted); *see also Lewis v. Fresne*, 252 F.3d 352, 359 & n.6 (5th Cir. 2001) (discussing and applying doctrine to find it applicable to one of two defendants and describing it as operative where the "plaintiff's claim rests on nothing more than [defendant]'s status as a corporate officer").   The doctrine does not protect a corporate officer "if the individual's personal interests motivate his actions . . ." as where a corporate officer allegedly misleads an investor to obtain the personal benefit of keeping a privately-held business in which he apparently has a substantial stake afloat.   *Lewis*, 252 F.3d at 359 n.6 (quoting *Darovec Mktg. Group, Inc. v. Bio–Genics, Inc.*, 42 F.Supp.2d 810, 819 (N.D. Ill. 1999)) (holding officer had

sufficient personal motivation for alleged fraud on investor to overcome fiduciary shield).  The fiduciary-shield doctrine also "does not preclude [the Court] from imputing the jurisdictional contacts of a predecessor corporation to its successor corporation or individual alter ego . . . because the two corporations (or the corporation and its individual alter ego) are the same entity, the jurisdictional contacts of one are the jurisdictional contacts of the other for the purposes of the International Shoe due process analysis."  *Stewart*, 772 F.2d at 653 (citing *Lakota Girl Scout Council Inc. v. Havey Fund-Raising Mgmt., Inc.*, 519 F.2d 634, 637 (8th Cir. 1975)); *see also id*. at 653 n.18 (collecting cases discussing other circumstances in which this rationale applies to impute the contacts including corporate parent-subsidiary relationship).

Plaintiffs' Second Amended Complaint includes no alter-ego or similar theory imputing API's contacts to Flaming, and many of Plaintiff's factual allegations do not differentiate between API and Flaming.  Plaintiffs allege that "Flaming serves as API's chief executive, and she undertook or authorized all API acts alleged in this document." Dkt. No. 62 ¶ 24.  They have not argued and do not allege that Flaming is an alter ego of API; rather, Plaintiffs plead that Flaming supervises at least two employees.  *Id*. ¶ 23.  Plaintiffs specifically aver that Flaming acted on API's behalf when forming the API-YCCG contract by telephone.  *Id*. ¶ 29.  The complaint characterizes the agreement in terms of how API will perform, i.e., "contract provided that YCCG would pay API money and in exchange API would . . . ." *Id*. ¶ 30.  The next mention of Flaming frames a description of alleged discussions between Flaming and Robertson concerning the rate paid to hourly workers and terms of the workers' employment as "[p]ursuant to the YCCG-API contract." *Id*. ¶ 33; *see also id*. ¶ 36–38 (alleging that, as a result of discussions over several months led to knowledge of certain facts and a particular mental state but attributing mental state to API and purpose of conspiracy to API).  Lastly, API (rather than Flaming) drafted the H-2A application pursuant to that same contract, according to Plaintiffs.  *Id*. ¶ 39.

The failure to allege an alter-ego theory does not by itself justify application of the fiduciary-shield doctrine; if it did, the doctrine would become a jurisdictional stalking horse for the common-law doctrine of respondeat superior and indeed would expand its scope. *See Calder v. Jones*, 465 U.S. 783, 790 (1984) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)) (declining to import substantive First Amendment doctrine into analysis of minimum contacts in libel actions because "[t]o reintroduce those concerns at the jurisdictional stage would be a form of double counting"). Thus, the Supreme Court has held that, while an employer's contacts cannot be generally imputed to an employee, a defendant's employee status "does not somehow insulate it from jurisdiction," and, accordingly, a California court properly exercise personal jurisdiction over Florida defendants who allegedly were "primary participants in an alleged wrongdoing intentionally directed at California." *Calder*, 465 U.S. at 790; *see also id.* at 789 (stating that reporter and editor who wrote article forming basis of libel action conducted "intentional, and allegedly tortious, actions . . . expressly aimed at California"). Applying *Calder*, the Fifth Circuit in *Donovan* refused to find the fiduciary-shield doctrine prevents Texas plaintiffs from bringing a wage-and-hour lawsuit against an out-of-state owner of five hotels who hired the Texas employees who managed those hotels. *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 973–74 & n.10 (5th Cir. 1984). The *Donovan* Court found "[m]ost important" the fact that the defendant had been "sued for violations of the federal statute, under which he is statutorily characterized as an employer and is personally responsible for defaults because of his substantial personal control of the terms and conditions of the Texas employee's work in Texas." *Id.* at 973. Thus, the owner could not utilize his employee status to shield himself from personal liability when a federal statute would have made him personally liable and his contacts with Texas were connected with that allegation. *See id.*; *see also Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. Appx. 775, 793–95 (5th Cir. 2007) (unpublished) (applying *Donovan* and holding corporate officer who circulated allegedly fraudulent franchise circulars in Texas could not avail himself of fiduciary-shield doctrine although other corporate officers who did not

direct contacts at Texas could and opining that "neither Texas or federal law allowed the defendant to hide behind his corporate status"). In addition to what the Court has already recited, Plaintiffs in their Second Amended Complaint allege that API conducted "recruitment efforts" requiring Robertson and Flaming "to register as farm labor contractors under 29 U.S.C. § 1811." Dkt. No. 62 ¶ 49; *accord. Id.* ¶ 96. Similar to the hotel owner in *Donovan*, Plaintiffs here have made a prima facie showing that Flaming's Texas contacts subject her to congressionally-imposed personal liability as a farm labor contractor, *see* 29 U.S.C. § 1802 (2012), under the AWPA. *See* Dkt. No. 62 ¶ 98, 46—49 (alleging that Flaming transmitted statements to Department of Labor knowing they would likely be disseminated in Texas). This alone suffices under *Donovan* to support personal jurisdiction. *See Stewart* 746 F.2d at 973–74 & n.10 (rejecting fiduciary-shield doctrine as bar to claim where Congress's definition of employer encompassed individual defendant's in-state conduct). Moreover, Plaintiffs allege that Flaming conspired to commit and committed the intentional tort of fraud in Texas. *See* Dkt. No. 62 ¶¶ 127-139. That is, Plaintiffs have made a prima facie showing that Flaming was a "primary participant in an alleged wrongdoing directed" at Texas residents. *Calder*, 465 U.S. at 790; *see also Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 212–15 (5th Cir. 1999) (assuming allegations of fraud to be true at motion-to-dismiss stage, finding minimum contacts based on fraud and other common-law claims, and distinguishing cases stating that a single communication such as negotiating a contract in a forum does not establish minimum contacts on the ground that "[w]hen the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment"); *Gen. Retailers Servs., Inc.,* 255 F. Appx. at 795 (holding in case where plaintiff brought fraud claim that "while the fiduciary-shield doctrine could prohibit this court from ascribing acts of the Wireless Toyz to Simtob, it does not prohibit Simtob from being held personally liable for his own tortious conduct simply because he is an officer of a corporation."). The Court therefore finds that Plaintiffs have made a prima facie

showing of Flaming's minimum contacts in their Second Amended Complaint under *Calder* and its progeny.

Flaming does not separately argue that exercising personal jurisdiction in this action will offend traditional notions of fair play and substantial justice. *See* Reply 11-12, Dkt. No. 85. "Once a plaintiff has established minimum contacts, the burden shifts to the defendant to show the assertion of jurisdiction would be unfair." *Wien Air*, 195 F.3d at 215 (citing *Akro Corp. v. Luker*, 45 F.3d 1541, 1547 (1995)). Since Flaming has not carried this burden, the Court does not consider further whether she has made a "compelling case against it." *Id.* (other citation omitted); quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). The Court therefore concludes that Plaintiffs have made a prima facie showing of specific personal jurisdiction over Flaming in their Second Amended Complaint, obviating the need to consider general jurisdiction.

### III.   FAILURE TO STATE A CLAIM

Reprising arguments raised in opposition to Plaintiffs request to file their first amended complaint, Defendants maintain that the Second Amended Complaint fails to state a claim for which relief can be granted for three reasons. First, Plaintiffs have failed to plead their fraud-based claims with the particularity required by Federal Rule of Civil Procedure 9(b). Second, API and Flaming assert that Plaintiffs' well-pleaded facts do not show that they were farm labor contractors within the meaning of the AWPA. *See* 29 U.S.C. § 1802(6)–(7) (2012). Finally, Defendants argue that the live complaint does not plausibly allege a breach of the API-YCCG contract causally connected to Plaintiffs' claimed damages or show that Plaintiffs were intended third-party beneficiaries of that contract. The Court finds only Defendants' causation argument regarding the breach-of-contract claim persuasive.

### A. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009) (quoting *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also*, e.g., *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010). That is, "the complaint's 'factual allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes*, 624 F.3d at 210 (brackets omitted) (quoting *Twombly*, 550 U.S. at 555). The Supreme Court has opined that the well-worn maxim that a complaint must not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," first voiced in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957), "has earned its retirement. It is best forgotten as an incomplete, negative gloss on an accepted pleading standard . . . ." *Twombly*, 550 U.S. at 563.

When performing a Rule 12(b)(6) analysis, all well-pleaded facts in the complaint must be accepted as true, and the complaint must be construed in the light most favorable to the plaintiff. *S.E.C. v. Cuban*, 620 F.3d 551, 553 (5th Cir. 2010); *In re Great Lakes*, 624 F.3d at 210 (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008)). However, "conclusory allegations, unwarranted factual inferences, [and] legal conclusions" need not be accepted as true. *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)); accord *Iqbal*, 556 U.S. at 662; *In re Great Lakes*, 624 F.3d at 210.

### B. Fraud-Based Claims

Federal Rule of Civil Procedure 9(b) requires a plaintiff to "state with particularity the circumstances constituting the fraud." By its terms, Rule 9(b) applies to claims of fraud, and, since they do not differentiate between their fraud and negligent-misrepresentation claims in their response to the pending motion to dismiss, *see* Dkt. No. 75 Ex. 1 at 7–10, Plaintiff's negligent misrepresentation claim must also satisfy the heightened pleading standard of Rule 9(b).[2] *See*, *e.g., Lone*

---

[2] In their Reply to their Motion for Leave to File First Amended Complaint Dkt. No. 42, As they did previously, Plaintiffs treat their negligent misrepresentation and fraud claims as arising out of the same set of allegations and underlying facts. *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 540 F. Supp. 2d 800, 806 (S.D. Tex. 2007) (quoting *Am. Realty Trust, Inc. v. Hamilton Lane Advisors, Inc.*, 115 F. Appx. 662, 668 (5th Cir. 2004) (explaining that after the Fifth

*Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F. 3d 383, 387 (5th Cir. 2010) (citing *Benchmark Elec., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 723–24 (5th Cir. 2003)) (applying Texas law and holding that, "as the claims sound in fraud and negligent misrepresentation, Appellants must plead the misrepresentations with particularity under FED. RULE CIV. PROC. 9(b)"). Rule 9(b) requires, at a minimum, "that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud." *U.S. ex rel. Steury v. Cardinal Health, Inc.*, 625 F.3d 262, 266 (5th Cir. 2010) (citing *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997)); *see also Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.* 365 F.3d 353, 363 (5th Cir. 2004) (citing *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 177–78 (5th Cir. 1997). To satisfy Rule 9(b)'s pleading requirements, the plaintiffs must "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams v. WMX Tech., Inc.*, 112 F.3d 175, 177–78 (5th Cir. 1997)).

Citing this Court's decision in *Hernandez v. Ciba-Geigy Corp. USA*, Defendants maintain that Plaintiffs must satisfy the heightened pleading standards of Rule 9(b) when pleading their AWPA claims as well because all of those claims "sound in fraud." 200 F.R.D. 285, 291 (S.D. Tex. 2001) (Tagle, J.) (quotation omitted) ("Rule 9(b) looks beyond how the plaintiff phrases his or her complaint, and applies 'to all cases where the gravamen of the claim is fraud even though the theory supporting the claim is not technically termed fraud.'"). Because the plaintiffs' conspiracy to defraud and statutory claims in *Hernandez* were derivative of their fraud claims, this Court dismissed those claims under Rule 9(b). *See id*. at 291–92. A conspiracy claim which is derivative of a fraud claim must be dismissed if the plaintiff fails to plead the underlying fraud with the particularity required by Rule 9(b). *Compare Williams v. Allstate Fire and Cas. Ins. Co*., Civ. A. No. H-11-

---

Circuit's decision in *Benchmark Elec., Inc. v. J.M. Huber Corp*., 343 F. 3d 719, 723 (2003), "where plaintiffs clearly set out and distinguish separate claims for fraud and for negligent misrepresentation, the 'negligent misrepresentation claims are only subject to the liberal pleading requirements of Rule 8.'")

530, 2012 WL 1098424 at *7–*8 (S.D. Tex. Mar. 30, 2012) (citing *Highland Crusader Offshore Partners, L.P. v. LifeCare Holdings, Inc.*, 311 F.Appx. 422, 428 (2d. Cir. 2009)) (dismissing Texas conspiracy to commit fraud claims under Rule 9(b) because "[t]he plaintiffs' conspiracy to commit fraud claims are derivative of their fraud claims") *with Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619 (5th Cir. 1999). Accordingly, this Court in *Hernandez* did not automatically apply Rule 9(b) to the plaintiffs' statutory claims; instead, it provided the plaintiffs with an opportunity to clarify whether their claims under that statute sounded in fraud and only dismissed under Rule 9(b) when the plaintiffs "merely repeate[ed] their allegations." 200 F.R.D. at 292 n.5. Consistent with this principle, although Rule 9(b) does not apply by its terms to a claim of negligent misrepresentation, the Fifth Circuit "has applied the heightened pleading requirements when the parties have not urged a separate focus on the negligent misrepresentation claims." *Benchmark Elec., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 723 (5th Cir. 2003) (citing *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 177 (5th Cir. 1997)).

The Court does not need to decide to which of Plaintiffs' claims Rule 9(b) applies, however, because Plaintiffs' Second Amended Complaint satisfies the strictures of Rule 9(b). Plaintiffs have narrowed their theory of their fraud-based narrowed their claims to a specific objective they contend all Defendants shared: "to get H-2A visas for foreign guest workers without having to pay those workers the $9.27 wage required by DOL." Second Am. Compl. ¶ 136 (stating object of conspiracy). According to the complaint, Robertson and YCCG's superintendent Gallegos hatched a scheme to hire Gallegos's friends and relatives who reside in Mexico because they would accept a $7.35 hourly wage rather than the $9.27 per hour required by the DOL. *See id*. ¶¶ 19–22. Thus, the statements of the hourly wage YCCG offered contained in the Form ETA-790 (what) prepared by API and Flaming (who) and communicated to Plaintiffs on September 17–28, 2009, (when) at the offices of TWC in Cameron and Hidalgo Counties (where) constitute the "how" of the alleged fraud as pled in the Second Amended Complaint. *See id*. ¶¶ 35(b), 55–58. Defendants rely on Plaintiffs' allegation that Robertson interviewed each

Plaintiff by telephone to argue that Plaintiffs have not identified any fraudulent statements attributable to API or Flaming, *see id.* ¶ 58; *see also, e.g., Williams*, 175 F.3d at 180 (holding Rule 9(b) not satisfied where plaintiffs quoted from articles which did not quote a particular defendant and "merely sa[id] that the defendants were widely quoted or paraphrase[d] previous statements"), but this argument ignores Plaintiffs' allegation that Robertson "repeated three employment terms during those interviews." Second Am. Compl. ¶ 58. In context, to decide the instant motion, this Court must draw the reasonable inference that Plaintiffs previously learned of YCCG's terms of employment from the Form ETA-790 allegedly prepared by API. *See id.* ¶¶ 54–55 (alleging TWC received Form ETA-790 and "notified each of the six Plaintiffs of the job opportunity described in [the ETA-790], each Plaintiff expressed interest, and then TWC arranged for Darwin Robertson to interview each Plaintiff by telephone"). Thus, Plaintiffs plead their fraud-based claims with enough specificity to allow Defendants to prepare a defense and to limit any fishing expedition in discovery, to borrow a metaphor, to "a small pond that is either stocked or dead." *U.S. ex. rel. Grubbs v. Kanneganti*, 565 F.3d 180, 191 (5th Cir. 2009); (holding complaint adequately alleged scheme to produce fraudulent medical bills although it did not allege exact bill numbers and dates and observing that "Rule 9(b) should not be made to shoulder all the burden of policing abusive discovery").

### C. AWPA Claims

In their Second Amended Complaint, Plaintiffs bring claims against API and Flaming for violations of three sections of the AWPA. *See* Dkt. No. 62 ¶¶ 95–99 bringing claims under 29 U.S.C. § 1811, 1821(f)–(g), and 1822. "The AWPA is designed 'to assure necessary protections for migrant and seasonal agricultural workers.'" *Malacara v. Garber*, 353 F.3d 393, 398 (5th Cir. 2003) (quoting 29 U.S.C. § 1801). It must therefore be interpreted broadly in light of Congress's remedial purposes. *See id.* at 401–02 (citing legislative history of AWPA and *Bracamontes v. Weyerhaeuser Co.*, 840 F.2d 271, 276 (5th Cir. 1988) (other citation omitted)

(reasoning that construction of the family farm exemption of AWPA adopted by Fifth Circuit furthered "remedial goals of the AWPA").

Citing paragraphs 11, 21–25, and 47 of the "proposed complaint," Defendants seek dismissal of these claims.  M. To Dismiss 13–14, Dkt. No. 75 Ex. 1.  As Plaintiffs point out in their response, the cited paragraphs do not refer to the AWPA claims alleged in Plaintiffs' Second Amended Complaint; they apparently refer to Plaintiffs' proposed First Amended Complaint.  Dkt. No. 83 at 16.  Plaintiffs nonetheless respond to two of these arguments as though API and Flaming raised them as to their Second Amended Complaint.  In light of the Fifth Circuit's construction of the AWPA in *Malacara*, supra, neither argument warrants dismissal of Plaintiffs' AWPA claims.

### 1.  *Farm Labor Contracting Activity*

Two of the three sections of the AWPA API and Flaming allegedly violated applies by its terms to a "farm labor contractor."  *See* 29 U.S.C. § 1821(c)–(e) (requirements beginning "[e]ach farm labor contractor . . . .); 1821(f) ("No farm labor contractor . . . shall knowingly provide false or misleading information to any migrant agricultural worker . . . ."); *id*. § 1822(c) ("No farm labor contractor . . . ."). API and Flaming contend that Plaintiffs have failed to allege sufficient factual material showing either is a farm labor contractor within the meaning of the AWPA.  Congress defined a farm labor contractor in the AWPA as "any person, other than an agricultural employer, an agricultural association, or employee of an agricultural employer or agricultural association, who, for any money or other valuable consideration paid or promised to be paid, performs any farm labor contracting activity."  29 U.S.C. § 1802(7) (2012).  In turn, farm labor contracting activity "means recruiting, soliciting, hiring, employing, furnishing, or transporting any migrant or seasonal agricultural worker."  *Id*. § 1802(6).  The third AWPA provision on which Plaintiffs rely also regulates farm labor contracting activity.  *See id*. § 1811(a).  API and Flaming together argue that the Second Amended Complaint does not sufficiently allege that they took any of these six actions with regard to Plaintiffs or anyone else.

Construing the AWPA's definition of farm labor contracting activity in *Malacara*, supra, the Fifth Circuit held that a farmer did not delegate recruiting or any other farm labor contracting activity to the TWC by using it as a "clearinghouse" to make jobseekers in McAllen, Texas aware of opportunities at his farm. *See* 353 F.3d at 399–403; *see also id*. at 397 (finding TWC served as "clearinghouse, where a prospective employer could post information about available work and prospective applicants could learn about the job opportunities"). The *Malacara* Court explained that the AWPA's definition of farm labor contracting activity "collects a number of contractual endeavors: making a contract of employment ('hiring'), maintaining a worker in the labor force ('employing'), preparing to do these things ('recruiting' and 'soliciting'), and doing them for others ('furnishing') . . . [and] obtaining and paying for a ticket that brings the worker to the farm or sends him to the next one." *Id*. at 399–400 (citing *Flores v. Rios*, 36 F.3d 507, 513 (6th Cir. 1994)); *see also id*. at 400 (elaborating that, in context, "[i]n drafting the AWPA, Congress defined recruiting, soliciting, hiring, employing, furnishing, and transporting within the scope of contracting activities"). Because the record showed that the TWC "charged no fee for [its] services and did not purport to represent either the employer or employee," the farmer did not delegate contractual recruiting activity to it under the AWPA. *Id*. at 401. Like the farmer in *Malacara*, Plaintiffs' Second Amended Complaint alleges that Robertson "did not delegate any authority to hire to the TWC [or API], but rather [placed telephone calls] to Texas personally to interview Applicants . . . [and] personally extended job offers to applicants." *Id*.; *see* Second Am. Compl. ¶¶ 55—62 (alleging in section headed "Darwin Robertson Interviews and Hires Each Plaintiff" that "TWC arranged for [Robertson] to interview each plaintiff by telephone" and hired Plaintiffs). On the other hand, unlike in *Malacara*, Plaintiffs plausibly allege that API and Flaming "charged [a] fee for their services and . . . purport[ed] to represent" Robertson and YCCG on forms they knew would likely be forwarded for presentation to potential workers by the TWC. 355 F.3d at 400 (emphasizing that TWC did not do these things and so did not engage in recruiting).

At a minimum, Plaintiffs' Second Amended Complaint states a claim that Robertson and YCCG paid to delegate contract-related solicitation of domestic workers to API and Flaming.  *See* § 1801(6); *Malacara*, 355 F.3d at 400 (describing solicitation as activity preparatory to contracting with agricultural workers).  Plaintiffs plead that API agreed to "advertise the terms of employment offered by YCCG to domestic workers as required by federal law, including without limitation publication of the terms through the Texas Workforce Commission" with YCCG.  Second Am. Compl. ¶ 30(d).   In context, this averment plausibly alleges that Robertson delegated to API for money the preparatory activity of soliciting domestic workers covered by the AWPA, especially when contrasted with the fact which this Court accepts as true for present purposes that Robertson reserved to himself the right to conduct all recruiting of foreign guest workers although API would advise him on what to say to such workers.  *See id.* ¶ 30(f).  This  assertion viewed in the light most favorable to Plaintiffs permits the plausible inference that Robertson vested API with discretion to solicit workers for YCCG in any way that would comply with federal law based on API's expertise in such matters.  *See id.* ¶ 25 (alleging that "API holds itself out to the public as an expert in helping agricultural employers access foreign guest workers under the 'H2A' visa program.").  Consequently, these averments distinguish API's role at the Rule 12(b)(6) stage from that of a clearinghouse used to communicate the availability of work like the TWC or a newspaper.  *See Malacara*, 355 F.3d at 399–400 (emphasizing that farmer did not "delegate statutory contracting activities").  The Court therefore finds that Plaintiffs' Second Amended Complaint states a plausible claim that API and Flaming engaged in farm labor contracting activity within the meaning of the AWPA.

### 2.  *Violation of "Any Working Arrangement"*

In paragraph 98(b) of their Second Amended Complaint, Plaintiffs allege in conclusory fashion that "API and Flaming intentionally violated Plaintiffs' AWPA rights by, inter alia,  . . .  failing to comply with the terms of the working

arrangement with each plaintiff in violation of 29 U.S.C.[3] Section 1822(c)."  Section 1822(c) provides that "[n]o farm labor contractor, agricultural employer, or agricultural association shall, without justification, violate the terms of any working arrangement."  API and Flaming argue this claim should be dismissed because Plaintiffs do not allege that they entered into a working arrangement with API or Flaming.  However, they acknowledge that the Second Amended Complaint adequately alleges that Plaintiffs formed a working arrangement with YCCG and Robertson.  *See* Am. Compl. ¶ 72, 110.  These allegations suffice to allege a § 1822(c) violation.

API and Flaming cite no legal authority for the proposition on which their argument rests: "there is no allegation that API [rather than Robertson and YCCG] entered into a working arrangement with the workers.  Without an arrangement, neither API nor Ms. Flaming could have violated one."  M. to Dismiss 13.  Section 1822(c) includes no language facially limiting a farm labor contractor's liability to a working arrangement into which it has entered.  *See, e.g., Serna v. Law Office of Joseph Onwuteaka, P.C.*, 732 F.3d 440, 443 (5th Cir. 2013) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (other citation omitted) ("As with any statutory interpretation, we first turn to the text because when a statute's language is plain we must enforce it according to its terms.").  On the contrary, Congress qualified "working arrangement" in § 1822(c) with an indefinite pronoun, prohibiting, "without justification, violat[ing] the terms of *any* working arrangement."  29 U.S.C. § 1822(c) (2012) (emphasis added).  The word any used by Congress in this subsection "has an expansive meaning.  It can broaden to the maximum, but never change in the least, the clear meaning of the phrase selected by Congress."  *Freeman v. Quicken Loans, Inc.*, 132 S.Ct. 2034, 2042 (2012) (quoting in part *Dept. of Housing and Urban Dev. v. Rucker*, 535 U.S. 125, 131 (2002)).  The motion before the Court does not call upon the Court to chart the

---

[3] Plaintiffs also argue in their response that the Form ETA-790 sufficed to form a working arrangement, but the Court does not read the API Defendants' motion to dismiss as raising such an argument and therefore declines to address that question at this time.

outer boundaries of the phrase "any working arrangement" in Section 1822(c).  The parties have not briefed that issue.  On this record, the Court rejects as inconsistent with the AWPA's language the broad proposition that a farm labor contractor can never be held liable under 29 U.S.C. § 1822(c) for violating a working arrangement into which it did not enter, especially in light of the remedial purposes of the AWPA. *See Malacara*, 355 F.3d at 401; *Bracamontes v. Weyerhaeuser Co.*, 840 F.2d 271, 276 (5th Cir. 1988) (footnote and citations omitted) (AWPA "is remedial in nature and must be read broadly."); *cf. also Soliz v. Plunkett*, 615 F.2d 272, 277 (5th Cir. 1980) (holding under AWPA's predecessor statute that "[a] person may not insulate himself from the provisions of the Act by simply conducting his farm labor contractor activities through underlings who deal more directly with the workers" as could happen if an agricultural employer could isolate itself by arguing that its underlings violated the working arrangement and so no liability could attach).

### D. Breach of Contract

Plaintiffs do not allege that they formed a contract with API or Flaming.[4]  *See* Second Am. Compl. ¶ 107 (alleging Plaintiffs formed employment contract with YCCG).  Instead, they seek to enforce an alleged service agreement between API and YCCG on the theory that they are intended third-party creditor beneficiaries of that contract.[5]  *See id.* ¶¶ 30, 113–14, 117.  Under Texas law, the essential elements in a breach of contract claim are as follows: "(1) the existence of a valid contract; (2) that the plaintiff performed or tendered performance; (3) that the defendant breached the contract; and (4) that the plaintiff was damaged as a result of the

---

[4] The Court reads Plaintiffs' Second Amended Complaint as eschewing an allegation that Flaming was a party to the contract Plaintiffs seek to enforce.  Under the heading "Breach of Contract by API," for example, Plaintiffs plead that "API entered into a services contract with YCCG prior to August 1, 2009."  Second Am. Compl. ¶ 113.  Plaintiffs elaborate in the next paragraph that "[t]he YCCG-API contract provided that YCCG would pay API money, and in exchange API would perform the services stated in paragraph 30."  *Id.* ¶ 114.

[5] As this Court explained in its order denying Plaintiffs' motion to amend their complaint, claims for breach of contract generally do not have to be pleaded with the specificity required by Rule 9(b), and the Court therefore analyzes this claim under Rule 8(a).  e.g., *Chau v. Aviva Life and Annuity Co.*, Civ. A. No. 3:09–CV–2305–B, 2012 WL 6522150, at *3 N.5 (N.D. Tex. Dec. 14, 2012) (applying of Rule 12(b)(6) standard to breach-of-contract claim because "applying Rule 9(b) to a breach of contract claim is generally inappropriate").

breach." *Bridgmon v. Array Sys. Corp.*, 325 F.3d 572, 577 (5th Cir. 2003) (alterations and internal quotations omitted) (quoting *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 593 (Tex. App.-Houston [14th Dist.] 2000). Defendants argue in their motion to dismiss that Plaintiffs have not adequately alleged that API breached its services agreement with YCCG or that the purported breach proximately caused damage to Plaintiffs. In any event, continue Defendants, the Second Amended Complaint does not allege plausible facts rebutting the Texas-law presumption that API and YCCG contracted for themselves and did not intend their services contract to be enforceable by Plaintiffs. *See, e.g., Basic Capital Mgmt., Inc. v. Dynex Comm., Inc.*, 348 S.W.3d 894, 900 (Tex. 2011) (citing *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651 (Tex. 1999) ("[A] presumption exists that parties contracted for themselves unless it clearly appears that they intended a third party to benefit from the contract."). Plaintiffs rely on multiple theories in support of their breach-of-contract claims against API and Flaming. *See* Second Am. Compl. ¶¶ 36, 116.

As an initial matter, Plaintiffs' Second Amended Complaint states a plausible claim that API breached its alleged oral agreement with API. Under Texas Law, "[a] breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform." *Worldwide Asset Purchasing, L.L.C. v. Rent-A-Center E., Inc.*, 290 S.W.3d 554, 561 (Tex. App.-Dallas 2009) (citing *Stewart v. Sanmina Tex., L.P.*, 156 S.W.3d 198, 214 (Tex. App.-Dallas 2005) (no pet.)); accord. *SW. Bell Tel. Co. v. Fitch*, 801 F.Supp.2d 556, 566 (S.D. Tex. 2011) (citations omitted). Plaintiffs plead that API allegedly breached its contract with YCCG by: (1) "failing to adequately inform YCCG of the requirements of federal law for the H2A visa program;" and (2) "misstating to DOL and Plaintiffs the terms of H2A employment that YCCG actually offered, as YCCG alleges in [YCCG's Third-Party Complaint] at paragraphs 5 to 10."[6] Second Am. Compl. ¶ 116. Citing nothing in

---

[6] Plaintiffs qualified their theories of breach by pleading that "API breached its contract with YCCG by, inter alia, . . . ." Secomd Am. Compl. ¶ 116. The trailing Latin phrase means "among other things." BLACK'S LAW DICTIONARY 883 (9th Ed. 2009). Plaintiffs do not specify other theories in their response to Defendants' motion to dismiss, however, this Court previously found their

Plaintiffs' Second Amended Complaint, API argues that no breach occurred because "[its] role was to help YCCG through the maze of government paperwork associated with the H-2A program." Dkt. No. 75 Ex. 1 at 12. The subtext of this argument appears to be that API did not expressly or impliedly promise to provide YCCG with accurate advice regarding the wage that must be paid under the H-2A program or to communicate accurately the wage YCCG would pay to the DOL. *See id.* However, this Court must accept as true for purposes of the instant motion Plaintiffs' allegation that API "holds itself out to the public as an expert in helping agricultural employers access foreign guest workers under the 'H2A' visa program." Second Am. Compl. ¶ 25; *see also, e.g., Greenspoon Marder, P.A. v. Andry Law Firm, LLC*, Civ. A. No. 13-5509, 2013 WL 6004054, at *3 (E.D. La. Nov. 13, 2013) (holding complaint plausibly alleged breach of contract and disregarding defendants' representations about nature of agreement at 12(b)(6) stage). In light of that averment which is made in the context of the API-YCCG relationship described in the Second Amended Complaint, *see id.* ¶¶ 25–36, Plaintiffs' allegation that API agreed to act as YCCG's agent with the DOL and "inform YCCG of YCCG's H2A obligations under federal law" becomes plausible. *Id.* ¶¶ 30(a)–(b); *see also, e.g., Highland Capital Mgmt., L.P. v. Bank of Am.*, Nat'l. Ass'n, 698 F.3d 202, 207–08 (5th Cir. 2012) (per curiam) (holding plaintiff stated claim for breach of oral contract under New York law despite defendant's representation that that subsequent e-mail messages purportedly showed parties did not intend to be bound by oral agreement because plaintiff "asserted in its complaint that the parties did not reserve any non-industry, non-LSTA standard terms [in the oral agreement], but [defendant] nonetheless demanded non-standard terms after [the parties reached the oral agreement]"); *Greenspoon Marder*, 2013 WL 6004054, at *3 (finding complaint properly alleged fee-splitting agreement between attorneys in part based on language of attorney-client agreement which made inference of fee-splitting arrangement plausible). Even if the Court accepted API's version of the

---

breach-of-contract allegations insufficient to allege plausibly a breach of the API-YCCG contract, giving them notice of the need to articulate these theories. *See* Dkt. No. 59 at 5-7.

terms of the API-YCCG contract as true, the failure to provide advice about the wage that must be paid to H-2A workers and failure to transmit accurate information to the DOL about the wage that a client is willing to offer plausibly breaks an express or implied promise to "help [the client] through the maze of paperwork associated with the H-2A program."[7] M. to Dismiss 12.

However, Plaintiffs do not state a plausible claim of causation under Rule 8(a). To make out a breach of contract claim, a plaintiff must allege facts plausibly showing that the breach caused the damages. *See, e.g., Amigo Broadcasting, LP v. Spanish Broadcasting Sys., Inc.*, 521 F.3d 472, 482-83 (5th Cir. 2008) (citing *Stewart v. Basey*, 245 S.W.2d 484, 486 (1952)); *Jones v. DRG Fin. Corp.*, 722 S.W.2d 402, 405-406 (Tex. 1987) (considering whether sufficient evidence existed to support trial court's causation finding on breach-of-contract claim); *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 688 (Tex. 1981) (upholding causation finding of jury against weight-of-evidence challenge); *S. Nat'l. Bank of Houston v. Crateo, Inc.*, 458 F.2d 688, 697 (5th Cir. 1972) (citing *Houston & T. C. R. Co. v. Maxwell*, 128 S.W. 160 (1910)) ("[A] showing of proximate caus[ation] [on Texas breach-of-contract claim] need not rise to the level of proving that the defendant's breach was the sole cause of damage."); *Hoffman v. L & M Arts*, Civ. A. No. 3:10-CV-0953-D, 2011 WL 3567419, at *8 (N.D. Tex. Aug. 15, 2011) (analyzing factual averments of complaint on Rule 12(b)(6) motion and concluding that "second amended complaint pleads facts that enable the court to infer a connection between L & M's conduct and the Sotheby's auction"). To prove that their complaint alleges proximate causation, Plaintiffs refer the Court to paragraphs 115(b) and 118 of their Second Amended Complaint. *See* Resp. To M. to Dismiss 15–16. Paragraph 115 reads "API's breach of its contract with YCCG proximately caused Plaintiffs injury." Dkt. No. 62 ¶ 118. Because this paragraph amounts to no more than a "[t]hreadbare recital[] of [this]

---

[7] To be clear, the Court does not imply a warranty in the API-YCCG contract that API would perform in a good and workman-like manner. *See, e.g., Rocky Mountain Helicopters, Inc. v. Lubbock Cnty. Hosp. Dist.*, 987 S.W.2d 50, 53 (Tex. 1999) (refusing to imply such a warranty in a services contract in part because breach-of-contract and negligence remedies were available). The court accepts as true for purposes of the instant motion Plaintiffs' allegations regarding what API expressly or impliedly promised to YCCG.

element[] of [Plaintiffs'] cause of action, supported by [a] mere conclusory statement[]," it does not suffice to survive a Rule 12(b)(6) motion. *Gibson v. Tex. Dept. of Ins.*, 700 F.3d 227, 233 (5th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

Nor does the second allegation to which Plaintiffs point even when viewed in the light most favorable to them.  Incorporating a portion of YCCG's third-party complaint, *see* Dkt. No. 18 ¶¶ 5-10, paragraph 115(b), quoted supra, asserts that API breached its contract with YCCG by misstating to DOL and Plaintiffs the terms offered by YCCG.  *See* Dkt. No. 62 ¶ 115(b).  The third-party complaint specifies only one term API allegedly misstated.  YCCG alleged that it initially told API that YCCG needed workers for a six-month period from September of 2009 through February of 2010 but at an unspecified later date instructed API to modify YCCG's application to the DOL to reflect that it would need workers only from on or about October 15, 2009, through January 1, 2010.  *See* Dkt. No. 18 ¶¶ 5–6.  YCCG sought to assert a third-party claim against API based on the allegation that API failed to follow those instructions, and "API provided the incorrect employment terms to Plaintiffs."[8] *Id.* ¶ 9.  Nowhere in their complaint or response to Defendants' motion to dismiss do Plaintiffs even assert that they would not have accepted Robertson's offer of employment or traveled to Plains if they had known that their employment at YCCG would last only until January 15 or February, 2010.  To the contrary, Plaintiffs allege that they left within three weeks after they arrived in October of

---

[8] These allegations appear to be in tension with Plaintiffs' version of events.  Plaintiffs also allege that, "during the interviews [conducted at the TWC], Darwin Robertson repeated that. . . the term of employment would be 10 months until August 1, 2010."  Second Am. Compl. ¶ 58.  Robertson hired each Plaintiff on the date of the interview, according to Plaintiffs, *see id.* ¶ 60, and Plaintiffs began to perform by making arrangements to travel to Plains, Texas.  *See id.* ¶ 73.  Finally, Plaintiffs aver that "[t]he only statement made by Darwin Robertson during these interviews that was inconsistent with YCCG's form ETA 790 . . . was that YCCG anticipated moving the start date of employment from October 1 to October 15, 2009.  TWC documented this. . . . ."  *Id.* ¶ 59.  These averments imply that each plaintiff relied on Robertson and that Robertson either had not yet decided to shorten the term of employment when he hired each Plaintiff or concealed that decision.  Plaintiffs correctly observe, however, that they may plead theories in the alternative and may therefore disavow their factual statements about what Robertson said to them in this context.  *See* Fed. R. Civ. P. 8(d)(2); *Fowler v. U.S. Bank, Nat'l. Ass'n*, ____ F. Supp. 2d ___, 2014 WL 850527, at *9 (S.D. Tex. 2014) (collecting cases and denying motion to dismiss based on doctrine that a plaintiff can plead alternative and inconsistent theories).

2009 because their complaints about the hourly rate YCCG paid them fell on deaf ears. *See* Second Am. Compl. ¶¶ 79–81. Hence, Plaintiffs' Second Amended Complaint allows only speculation about the causal relationship between API's alleged failure to correct the term of employment in the Form ETA-790 and the damages allegedly suffered by Plaintiffs which is insufficient under Rule 8(a). *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that factual allegations in the complaint "must be enough to raise a right to relief above the speculative level"); *see also Amigo Broadcasting, LP* 521 F.3d at 476 (affirming dismissal of claim for breach of license agreement in which party sought to recoup investment because "it did not produce any evidence that it made this investment in reliance on the license agreement"); *Jones,* 722 S.W.2d at 405-06 (holding evidence of causation sufficient in breach of contract action against corporation that assisted plaintiff with filing applications for U.S. Department of Housing and Urban Development financing to determine whether plaintiff had presented more than a scintilla of evidence that the financing opportunity he allegedly lost would have been granted if defendant had performed); *Hoffman*, 2011 WL 3567419, at *8 (relying on specific factual averments linking damages with alleged breach); *Reneker v. Offill*, Civ. A. No. 3:08-CV-1394-D, 2009 WL 3365616, at *6 (N.D. Tex. Oct. 20, 2009) (holding complaint's allegations too speculative to state claim on causation element based on attorney's failure to give advice because complaint did not plead that clients would have heeded advice and ceased illegal activity which produced harm to plaintiff). The Court therefore expresses no opinion on whether the Second Amended Complaint adequately alleges a claim that Plaintiffs are intended third-party beneficiaries of the API-YCCG contract.

Plaintiffs do not request leave to amend their Second Amended Complaint, and this Court found Plaintiffs' first proposed amended complaint failed to state a breach-of-contract claim against API for which relief can be granted. *See* Dkt. No. 59 at 5–6. Additionally, Plaintiffs had the opportunity to amend their Second Amended Complaint as a matter of course in response to the instant motion. *See* FED. R. CIV. P. 15(a)(1). Consequently, although their Second Amended Complaint

represents Plaintiffs' second attempt to plead this claim, they have had three opportunities to correct this defect. *See, e.g., Torch Liquidating Trust ex rel. Bridge Assoc. L.L.C. v. Stockstill*, 561 F.3d 377, 390–91 (5th Cir. 2009) (affirming denial of leave to amend amended complaint in part because "at no point did plaintiff move the district court for leave to amend its amended complaint to allege a claim showing injury to [defendant]"); *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607–08 (5th Cir. 1998); quoted in *Torch*, 561 F.3d at 391 (district court did not abuse discretion in denying leave to amend where Plaintiffs "had three opportunities to articulate their damage theory").  After considering the equitable factors under Federal Rule of Civil Procedure 15(a)(2), the Court finds that granting Plaintiffs a fourth opportunity to plead their breach-of-contract claim is not in the interest of justice.

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss, Dkt. No. 75, and **DISMISSES** Plaintiffs' breach-of-contract claim against API, Dkt. No. 62 ¶¶ 113–18, **WITH PREJUDICE**. The Court **DENIES** all other relief requested by Defendants in their Motion to Dismiss, Dkt. No. 75.

In light of its disposition of the instant motion, the Court **ORDERS** the parties to confer and file a joint status report and proposed scheduling order within 21 days after the entry of this order.  If any party wishes leave to conduct discovery, all parties must conduct a supplemental Federal Rule of Civil Procedure 26(f) conference and submit a supplemental Joint Discovery/Case Management Plan with the proposed scheduling order required by the preceding sentence.


SIGNED this 31st day of March, 2014.

Hilda Tagle
Senior United States District Judge